In the Matter of an Application to Enforce Administrative Subpoena Duces Tecum of the SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,

v.

ESM GOVERNMENT SECURITIES, INC., Defendant-Appellant.

No. 79–2868.

United States Court of Appeals,
Fifth Circuit.
Unit B

May 18, 1981.

Arky, Freed, Stearns, Watson & Greer, Bruce W. Greer, Gerald B. Cope, Jr., Miami, Fla., for defendant-appellant.

David A. Sirignano, Rosalind C. Cohen, Jacob H. Stillman, Frederick B. Wade, Securities & Exchange Comm., Washington, D. C., for plaintiff-appellee.

Before TUTTLE, VANCE and POLITZ, Circuit Judges.

VANCE, Circuit Judge:

The Securities and Exchange Commission (SEC) applied to the district court below to enforce an administrative subpoena duces tecum against ESM Government Securities, Inc. (ESM). ESM responded that the application should be denied because of alleged fraud and deceit by the SEC.[1] The court ordered that the subpoena be enforced, and ESM appeals.

I.

The court below made no findings of fact. After hearing the opening statements of the attorneys, it held that even were all of ESM's allegations correct, there would still be no grounds to deny enforcement of the subpoena. For purposes of review, therefore, we shall accept the allegations made by ESM in its statements below as correct.

We note, however, that several of the allegations are denied by the SEC.

ESM is a wholly owned subsidiary of ESM Group, Inc. It is a broker-dealer engaged exclusively in the sale of government securities. It shares a suite of offices with another wholly owned subsidiary of ESM Group, Inc., ESM Securities, Inc., a broker-dealer in other types of securities. For present purposes the important distinction between the two is the different nature of SEC supervision. Government securities are exempt from many provisions of the securities laws. See 15 U.S.C. §§ 77c(a)(2), 78c(a)(12). Thus while ESM Securities, Inc. is open to routine inspection by the SEC, ESM is not.

In March or April of 1977 an investigator for the SEC, Floyd Young, came to the ESM offices. He explained that he was in the building investigating another government securities firm. He added that, in addition to doing a routine audit of ESM Securities, Inc., he would like ESM to provide him with a basic education in the government securities market. Since the SEC does not routinely supervise broker-dealers in government securities, ESM found Young's request plausible. They therefore provided him with a tour of their operations, explaining all their procedures. At the end of the day, Young left, saying that he would be back for further study.

In June the SEC ordered an investigation of ESM. At Young's suggestion no subpoena was issued. Indeed, ESM was not notified that any investigation had been ordered. Instead, in November Young returned to the ESM offices with a new staff attorney. He asked that ESM repeat for them the tour it had provided earlier and that he be permitted to continue his education in government securities. ESM agreed to this. ESM ran the SEC investigators through the tour, and then ESM provided them with documents they wished to review. The SEC attorneys returned two

---

1. ESM also challenged enforcement of the subpoena on the grounds that it exceeded the scope of investigation authorized by the SEC order. The court rejected this argument, and it has not been appealed. We therefore treat it as abandoned.

more days for further "education." At the end of the third day, ESM finally grew suspicious when the SEC investigators asked for copies of commission schedules. At that point the SEC investigators disclosed the formal order of investigation. ESM immediately asked them to leave, which they did. On the basis of the information they had gathered during their stay at ESM, the SEC investigators issued a subpoena. When ESM refused to comply with the subpoena, the SEC applied to the district court for enforcement. *See* 15 U.S.C. §§ 77v(b), 78u(c).

## II.

The question before us is whether this set of facts would be grounds for denying enforcement of an administrative subpoena. The SEC claims that this case is controlled by *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). *Calandra* dealt with grand jury testimony. Based on a warrant, federal agents searched Calandra's place of business and seized certain books and records. A grand jury was then convened, which subpoenaed Calandra to question him regarding the seized materials. The district court found that the warrant had been issued without probable cause and that the search had exceeded the scope of the warrant. It therefore ordered that Calandra need not answer the grand jury questions based on the suppressed evidence. The Supreme Court reversed, holding that the fourth amendment exclusionary rule does not apply to grand jury testimony.

■ The SEC argues that the same principle should apply to administrative subpoenas. It is true that administrative subpoenas are in some respects analogous to grand jury investigations. *See United States v. Davis*, 636 F.2d 1028, 1037 (5th Cir. 1981). However, the Supreme Court has carefully refrained from suggesting that administra-

tive investigations are identical in all respects to legislative or judicial investigations. *See Hannah v. Larche*, 363 U.S. 420, 449, 80 S.Ct. 1502, 1518, 4 L.Ed.2d 1307 (1960). Indeed, were this a grand jury subpoena, the case would not be before us, since denial of a motion to quash a grand jury subpoena cannot be appealed. *Compare United States v. Ryan*, 402 U.S. 530, 532, 91 S.Ct. 1580, 1581, 29 L.Ed.2d 85 (1971) (no appeal from grand jury subpoena) *with Reisman v. Caplin*, 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964) (administrative subpoena can be appealed). The holding of *Calandra* is thus not dispositive of the present case and we must consider whether its reasoning applies to the facts before us.[2]

We are not persuaded that *Calandra* is applicable here. The Court gave two reasons for its holding regarding grand juries. First, it emphasized the historic role of the grand jury in Anglo-American jurisprudence. In particular it noted that the grand jury is not merely an instrument of investigation, but also "essential to basic liberties." 414 U.S. at 343, 94 S.Ct. at 617.

> The grand jury's historic functions . . . include . . . the protection of citizens against unfounded criminal prosecutions.

*Id.* at 343, 94 S.Ct. at 617.

Second, the Court doubted that extending the exclusionary rule to grand juries would deter police misconduct.

> The incentive to disregard the requirement of the Fourth Amendment solely to obtain an indictment from a grand jury is substantially negated by the inadmissibility of the illegally seized evidence in a subsequent criminal prosecution of the search victim.

*Id.* at 351, 94 S.Ct. at 621.

■ Neither of these two arguments fully applies to an SEC subpoena. Although the SEC has a dual function, it is not an

---

**2.** In *United States v. Davis*, 636 F.2d 1028, 1035 n.4 (5th Cir. 1981), another panel of this court suggested that *Calandra* might be applicable to an administrative summons. Since Davis did not show that the summons at issue derived from the illegal search and since it was doubt-

ful that Davis had standing to raise the question, the court did not rule on the merits. Even were the language in *Davis* more definite than it is, we would not be bound by its unsupported dictum. *See United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980).

historic guardian of individual liberties. Instead, its two functions are investigation of possible illegal activities, and adjudication of alleged violations. *Hannah v. Larche*, 363 U.S. at 446–47, 80 S.Ct. at 1516–1517. The SEC is not, like the grand jury, a protector of individuals against government prosecution. Nor is the deterrent effect of an exclusionary rule so clearly minimal when applied to the SEC. In the first place it is the SEC itself which commits the violations to which the rule would be applied. There is no division of functions comparable to that between police and the grand jury. In the second place the SEC does not rely on criminal prosecutions as its exclusive tool of enforcement. Persuasion, disclosure and rule-making are all weapons in its armory which are unaffected by exclusion of evidence in judicial proceedings. Hence, the sanction relied upon by the Court in *Calandra* is considerably less effective in this context.

We do not deduce from this line of reasoning that the exclusionary rule necessarily should or should not apply to SEC subpoenas. All we conclude at this point is that the question is not foreclosed by *Calandra*. We must, therefore, examine the law which has developed regarding administrative investigations and subpoenas.

**3.** *Reisman v. Caplin*, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964); *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), and *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), all involved enforcement of an IRS summons, 26 U.S.C. §§ 7402(b) and 7604(a). It is generally agreed, however, that the principles of these cases apply to SEC subpoenas as well. *See SEC v. Wheeling-Pittsburgh Steel Corp.*, [1981] Fed.Sec.L.Rep. (CCH) ¶ 97,833 at n.5 (3d Cir. Jan. 21, 1981) (en banc); *SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1024 n.39 (D.C.Cir.1978), *cert. denied*, 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979); *SEC v. Howatt*, 525 F.2d 226, 229 (1st Cir. 1975); *SEC v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047, 1056 (2d Cir. 1973), *cert. denied*, 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974). Although this circuit has not reached this particular issue before, we have applied IRS cases to other administrative subpoenas. *See, e. g., Atlantic Richfield Co. v. FTC*, 546 F.2d 646, 648 (5th Cir. 1977).

In applying IRS cases to the issue before us, we do not suggest that every aspect of the law

### III.

We begin our inquiry with *Reisman v. Caplin*, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964). In *Reisman* the recipient of an IRS summons sought injunctive relief from a district court. The Supreme Court held that such relief was inappropriate, since the IRS could only enforce the summons by an action in court. At that time, the Court said, "the witness may challenge the summons on any appropriate ground." *Id.* at 449, 84 S.Ct. at 513. The Court elaborated in *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). There the Court held that the IRS did not need to show probable cause to obtain enforcement of its summons. After discussing the showing required of the IRS, the Court stated that such a showing could nevertheless be attacked upon a showing of abuse of process.[3] The Court declared: "It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." *Id.* at 58, 85 S.Ct. at 255.

The Supreme Court has never provided a complete list of the "appropriate ground[s]" referred to in *Reisman*. The Court has made clear that the fifth amendment privi-

regarding an IRS summons controls an SEC subpoena. *See, e. g., SEC v. Dresser Industries, Inc.*, 628 F.2d 1368, 1379–80 (D.C.Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980); *SEC v. Blackfoot Bituminous, Inc.*, 622 F.2d 512, 515 (10th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 362, 66 L.Ed.2d 220 (1980). These possible statutory differences are not relevant to the issues we are treating.

We note that there are numerous statutes requiring administrative agencies to turn to the courts for enforcement of their subpoenas, some statutes tracking the language of the securities laws, 15 U.S.C. §§ 77v(b), 78u(c). *See, e. g.,* 7 U.S.C. § 2717 (egg research); 12 U.S.C. § 1784(c) (Federal Credit Union Act); 16 U.S.C. § 470ff(c) (archeological resources protection); 16 U.S.C. § 1100b–5(e) (offshore shrimp fisheries). *See generally Gelbard v. United States*, 408 U.S. 41, 80–81, 92 S.Ct. 2357, 2377, 33 L.Ed.2d 179 (1972) (Rehnquist, J., dissenting) (discussing court enforcement of administrative subpoenas and citing statutes).

lege against self-incrimination is an appropriate ground. *See Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973); *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). So is the attorney-client privilege. *Reisman*, 375 U.S. at 449, 84 S.Ct. at 513. Other courts, including this one, have added to the list. *See, e. g., United States v. Holmes*, 614 F.2d 985, 989 (5th Cir. 1980) (free exercise of religion); *United States v. Citizens State Bank*, 612 F.2d 1091, 1093–94 (8th Cir. 1980) (freedom of association). A fourth amendment claim has also been held to be an appropriate ground. *See United States v. Bank of Commerce*, 405 F.2d 931, 934–35 (3d Cir. 1969). *Cf. United States v. Euge*, 444 U.S. 707, 718, 100 S.Ct. 874, 881, 63 L.Ed.2d 141 (1980) (enforcing summons for handwriting on grounds, *inter alia*, that "[c]ompulsion of handwriting exemplars is [not] a search or seizure subject to Fourth Amendment protections . . . .").[4]

Nor has the Court provided a definitive analysis of "abuse of process." In *Powell*, the Court said: "Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." 379 U.S. at 58, 85 S.Ct. at 255. *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57

L.Ed.2d 221 (1978) indicates that the various statements concerning abuse of process in *Powell* were not meant to be exhaustive. "Future cases may well reveal the need to prevent other forms of agency abuse of congressional authority and judicial process." *Id.* at 318 n.20, 98 S.Ct. at 2368 n.20.[5] The third circuit sitting en banc recently rejected the argument that "abuse of process" has been rigidly defined. We endorse its conclusions.

The implicit premise of the Commission's argument is that the judiciary's role is strictly confined by Supreme Court precedent and that, under these authorities, a court has little flexibility in confronting new situations. Although we agree that courts generally must defer to the agencies and that the scope of judicial inquiry is not expansive, we disagree with the Commission's premise that the Supreme Court has foreclosed incremental development of the law by the courts when we are faced with allegations of egregious abuses.

. . . .

. . . [B]ecause the Supreme Court has never confronted allegations like the ones before us does not mean that the federal judiciary is powerless to structure relief when necessary.

*SEC v. Wheeling-Pittsburgh Steel Corp.* [1981] Fed.Sec.L.Rep. (CCH) ¶ 97,833 (3d Cir. Jan. 21, 1981) (en banc). The court

---

4. Enforcement of a subpoena was also denied because of a fourth amendment violation in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). There government agents unlawfully seized and copied documents, returned them under court order, and then subpoenaed them from their original owner. The Court reversed a judgment of contempt of court against the owner, holding that the subpoena could not be enforced.

   *Silverthorne* involved a grand jury subpoena. In *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 206–07, 66 S.Ct. 494, 90 L.Ed. 614 (1946), the holding was incorporated into the law of administrative subpoenas as a case decided "by virtue of the presence of an actual illegal search and seizure, the effects of which the Government sought later to overcome by applying the more liberal doctrine devolved in relation to 'constructive search,'" i. e., subpoe-

na. *Calandra* restricted the scope of *Silverthorne* as far as grand jury subpoenas are concerned. *Calandra*, 414 U.S. at 352 n.8, 94 S.Ct. at 622 n.8. *Silverthorne's* continued vitality in administrative law is still an open question. Since our holding in this case is based on abuse of process, we do not need to reach that issue, but clearly to the extent that *Silverthorne* is viable it supports the result we reach on other grounds.

5. Earlier the Court noted: "The *Powell* elements were not intended as an exclusive statement about the meaning of good faith. They were examples of agency action not in good-faith pursuit of the congressionally authorized purposes of [26 U.S.C.] § 7602. The dispositive question in each case, then, is whether the Service is pursuing the authorized purposes in good faith." *LaSalle*, 437 U.S. at 317 n.19, 98 S.Ct. at 2368 n.19.

continued: " 'We conclude that from the very fact that enforcement of a . . . summons is . . . entrusted to the judiciary, this court has the power to fashion appropriate rules as to the fairness of the enforcement order.' " *Id.* quoting *United States v. Friedman,* 532 F.2d 928 (3d Cir. 1976).

We therefore turn to the question of whether the alleged conduct before us entails an abuse of process.

## IV.

We are guided in our analysis by two prior opinions in this circuit, *United States v. Tweel,* 550 F.2d 297 (5th Cir. 1977), and *Stuart v. United States,* 416 F.2d 459 (5th Cir. 1969). In *Tweel* an IRS agent asked to review Tweel's records as part of an audit of his tax returns. Tweel's accountant, concerned that this might be a criminal inquiry, asked whether a "special agent," the type normally involved in criminal investigations, was participating in the audit. The agent said no special agent was involved. Although factually correct, this response was misleading, since a criminal investigation was in fact underway. Based on the evidence acquired in the audit, Tweel was convicted of tax evasion.

We reversed the conviction. We recognized that the IRS agent had no affirmative duty to warn the taxpayer that the investigation might result in criminal charges.[6] We held, however, that the agent could not intentionally mislead the taxpayer.

> From the facts we find that the agent's failure to apprise the appellant of the obvious criminal nature of this investigation was a sneaky deliberate deception by the agent under the above standard and a flagrant disregard for appellant's rights. The silent misrepresentation was both intentionally misleading and material.

. . . .

We cannot condone this shocking conduct by the IRS. Our revenue system is based upon the good faith of the taxpayers and the taxpayers should be able to expect the same from the government in its enforcement and collection activities.

*Tweel,* 550 F.2d at 299–300 (footnote omitted).

*Stuart* involved an IRS summons. An IRS agent was assigned to conduct a civil investigation of Stuart's tax returns. Stuart kept her records in her own custody at a place inconvenient to the IRS agent. To accommodate the agent, Stuart transferred the records to the office of her accountant, where the agent examined them at length. When indications of fraud were discovered, the IRS assigned a special agent and issued a summons to the accountant for the records.

We held that the summons could not be enforced. All parties agreed that had the papers been in Stuart's custody, she could have refused production on grounds of self-incrimination. Alternatively, once Stuart had yielded custody of the records to a third party, even her accountant, she would have waived her privilege. We held that the transfer of the records to the accountant for the convenience of the IRS agent was not a waiver of privilege.

It should make no difference in this result that custody was changed in order to benefit the Government's employee (Agent Vaughn) and to facilitate her work. The Government should not gain an advantage because the taxpayers, acting reasonably as human beings and citizens, did it a favor and failed to insist that Mrs. Vaughn perform her inspection in uncomfortable circumstances and at

---

**6.** *Tweel* relied on principles stated in *United States v. Prudden,* 424 F.2d 1021 (5th Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970) and *United States v. Tonahill,* 430 F.2d 1042 (5th Cir.), *cert. denied,* 400 U.S. 943, 91 S.Ct. 242, 27 L.Ed.2d 247 (1970). "*Prudden* and *Tonahill* hold that evidence received from the taxpayer after the criminal investigation commenced is admissible, even though no notice or *Miranda* warnings were given. . . . These cases recognize that evidence obtained for criminal use by deceit, fraud and misrepresentation might be suppressed, but held that failure to advise the taxpayer that a criminal investigation was being made did not amount to such conduct." *United States v. Ponder,* 444 F.2d 816, 819 (5th Cir. 1971), *cert. denied,* 405 U.S. 918, 92 S.Ct. 944, 30 L.Ed.2d 788 (1972).

off-hours. To penalize appellants for their good-will would not only be unjust; it would hurt the Government in the long-run by encouraging taxpayers to keep close personal custody of their records no matter what the burden on the inspecting revenue agent.

*Stuart*, 416 F.2d at 463 (footnote omitted).

The key to both these cases, we believe, is the nature of the relationship between the government agent and the private citizen. We recognize that much law enforcement activity relies on the use of sanctions by the government. The police officer, the undercover agent, the FBI investigator, all threaten the potential miscreant with discovery and penalties. Thus people obey the law from fear of punishment. Many governments, indeed, depend exclusively on fear for their authority.

In this country, while we have recognized the importance of sanctions, we have never been willing to rely on them exclusively. Inherent in our democracy is a belief that, since the government represents the will of the people, the people will accept its dictates voluntarily. There is a sense of trust between the government and the people. It was the abuse of this trust which we could not accept in *Tweel* and *Stuart*.[7]

▮ We believe that a private person has the right to expect that the government, when acting in its own name, will behave honorably. When a government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the agent's representations. We think it clearly improper for a government agent to gain ac-

cess to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust. When that government agency then invokes the power of a court to gather the fruits of its deception, we hold that there is an abuse of process.

Will this court by sustaining the judgment below sanction such conduct on the part of the Executive? The governing principle has long been settled. It is that a court will not redress a wrong when he who invokes its aid has unclean hands.... Where the Government is the actor, the reasons for applying it are even more persuasive.

... The court's aid is denied only when he who seeks it has violated the law in connection with the very transaction as to which he seeks legal redress. Then aid is denied despite the defendant's wrong. It is denied in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination. The rule is one, not of action, but of inaction.... [T]he objection that the plaintiff comes with unclean hands will be taken by the court itself. It will be taken despite the wish to the contrary of all the parties to the litigation. The court protects itself.

Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipres-

7. Compare the situation in *Northside Realty Associates, Inc. v. United States*, 605 F.2d 1348 (5th Cir. 1979). There evidence of fair housing violations was obtained by testers who posed as prospective home buyers to check for compliance with the law. In rejecting a claim of fourth amendment violations, we noted that "[t]he testers did no more than what any member of the home-buying public is invited, and indeed welcomed, to do.... The testers did not enter into any restricted areas of the office, such as an employees' lounge. Nor did they examine or take any confidential or private papers. In other words, the testers behaved exactly as a prospective home buyer visiting a real estate office would be expected to behave. To the extent that Northside has held itself open to the public for just the sorts of visits that transpired here, Northside cannot complain that a privacy interest has been thwarted or embarrassed." 605 F.2d at 1355 (footnotes omitted). By contrast, in *Tweel* and *Stuart*, as in the case at hand, the government agents were given access to records not available to the general public, just because they were government agents.

ent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

*Olmstead v. United States,* 277 U.S. 438, 483–85, 48 S.Ct. 564, 574, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting) (footnotes omitted).

## V.

■ In holding that fraud, deceit or trickery is grounds for denying enforcement of an administrative subpoena, we exercise the well-established power of the courts to prevent abuse of process. "[T]he equitable powers of the courts of the United States, sitting as courts of law, over their own process, to prevent abuse, oppression and injustice, are inherent, and as extensive and efficient as may be required by the necessity for their exercise...." *Gumble v. Pitkin,* 124 U.S. 131, 145–46, 8 S.Ct. 379, 384, 31 L.Ed. 374 (1888). The Supreme Court's directives in *Powell* and *LaSalle* leave no doubt that this power may be properly invoked in cases involving the enforcement of administrative subpoenas. We note that this power is associated with

our supervisory power which is distinct from the fourth amendment exclusionary rule, although the goals may sometimes overlap. *See United States v. Payner,* 447 U.S. 727, 735 n.8, 100 S.Ct. 2439, 2446 n.8, 65 L.Ed.2d 468 (1980).[8] An agency subpoena must conform to certain fourth amendment requirements: "It is now well settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *See v. City of Seattle,* 387 U.S. 541, 544, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943 (1967). We do not hold, however, that any violation of the fourth amendment in the procurement of an administrative subpoena compels denial of its enforcement.

Consequently, the court should not invoke an automatic exclusionary rule. "The correct approach for determining whether to enforce a summons requires that court to evaluate the seriousness of the violation under all the circumstances, including the government's good faith and the degree of harm imposed by the unlawful conduct." *United States v. Bank of Moulton,* 614 F.2d 1063, 1066 (5th Cir. 1980). Each case must be examined on its facts.

■ In the case at bar, we find three points to be crucial. First, did the SEC intentionally or knowingly mislead ESM about the purposes of its review of ESM's

---

**8.** The SEC calls our attention to *United States v. Bonnell,* 483 F.Supp. 1070 (D.Minn.1979), *stayed pending appeal,* 483 F.Supp. 1091 (D.Minn.1979), for the proposition that the exclusionary rule should never apply to administrative subpoenas. The court in *Bonnell,* however, never considers the abuse of process requirement announced in *Powell* and *LaSalle.* Even assuming the SEC's interpretation of *Bonnell* is correct, we are therefore unpersuaded by its analysis.

The SEC also relies on the comment in *United States v. Janis,* 428 U.S. 433, 447, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976), that "the Court never has applied [the exclusionary rule] to exclude evidence from a civil proceeding, federal or state." However, the Court goes on

to point out that other federal courts have applied the rule to civil proceedings, and distinguishes those cases since "the officer committing the unconstitutional search or seizure was an agent of the sovereign that sought to use the evidence ...." as opposed to the facts in *Janis. Id.* at 455, 96 S.Ct. at 3032. This case fits the pattern of the cases the Court distinguished, not of *Janis.* In *Richey v. Smith,* 515 F.2d 1239, 1245 (5th Cir. 1979) we approved the remedy applied in *Lord v. Kelley,* 223 F.Supp. 684, 690–91 (D.Mass.1963), *appeal dismissed,* 334 F.2d 742 (1st Cir. 1964), *cert. denied,* 379 U.S. 961, 85 S.Ct. 650, 13 L.Ed.2d 556 (1965), which enjoined use by the IRS of improperly seized material in "any proceeding, criminal, civil, or administrative." *Id.* at 691.

files? Second, was ESM in fact misled?[9] *See United States v. Bland*, 458 F.2d 1, 8 (5th Cir.), *cert. denied*, 409 U.S. 843, 93 S.Ct. 43, 34 L.Ed.2d 83 (1972). Third, is the subpoena the result of the SEC's allegedly improper access to ESM's records? For each item being subpoenaed, if ESM establishes that the answer to all of these questions is affirmative, then enforcement of the subpoena would be an abuse of process and must be denied. Otherwise, the subpoena should be enforced. On remand the district court should make findings on these points[10] and thereafter enter its order in conformity with this opinion.

REVERSED and REMANDED.

**9.** The district court relied on *Prudden* to hold that the sophistication of ESM's personnel precluded any possibility of deception. The court was correct in recognizing that the sophistication of ESM's personnel might be relevant to a determination of whether or not they were in fact deceived. It went too far, though, in suggesting that mere sophistication, coupled with the length of the SEC's stay at ESM's offices, made deceit impossible. No degree of sophistication can guarantee that ESM would simply disbelieve a straightforward representation by a public official. Were the SEC to adopt the argument presented by the IRS in *Tweel*, to the effect that such deceptions were so common that no sophisticated person could be deceived, we would in return adopt *Tweel's* response.

During oral argument counsel for the government stated that these procedures were "routine". If that is the case we hope our message is clear. This sort of deception will not be tolerated and if this is the "routine" it should be corrected immediately. *Tweel*, 550 F.2d at 300 n.9. We note again, however, that the SEC denies that it engaged in any deception. We leave that factual dispute to the district court.

**10.** ESM also challenges the decision of the trial court not to grant discovery regarding certain items in Young's personnel file. The court reviewed this material in camera, and concluded that its only relevance was to affect slightly Young's credibility. Since the trial court's ruling on the main issue was not based on disputed facts, the court saw no point in releasing the material. Our holding necessitates a reconsideration of this matter by the trial court.