## PUBLIC SCHOOLS *v.* WALKER

1. The act of Congress of July 27th, 1831, *relinquishes* to the State of Missouri the lots, commons, &c., *reserved* for the use of schools by the act of June 12th, 1812, and nothing else.
2. The act of 1812 excluded from the reservation which it made, all lots rightfully claimed by private persons, and the report of the Board of Commissioners under the act of July 9th, 1832, in favor of such a claim and its confirmation by Congress, is evidence that it was rightful.
3. The fact that such a claim was barred by the limitation of the act of 1824 did not prove that it was not a rightful claim, nor prevent Congress from removing that bar, and allowing the claim to be proved and confirmed.
4. Such subsequent confirmation shows that the claim was a rightful one, when the act of 1812 was passed, and that the lot claimed was not included in the reservation for schools.

* Wetherbee *v.* Johnson, 14 Massachusetts, 412; Patrie *v.* Murray, 43 Barbour, 331.

ERROR to the Supreme Court of Missouri; the controversy being one of those, quite numerous in this court, growing out of the various acts of Congress intended to settle the land titles originating in the lands of Louisiana prior to its purchase by our government from France.  The case was thus:

The President and Directors of the St. Louis Public Schools brought suit, in the St. Louis Land Court of Missouri, against Walker and another, to recover certain lands situate in the city of St. Louis.

The title of the plaintiffs, who represented the common schools of St. Louis, rested on two acts of Congress.  The first of these was the act of June 13th, 1812,* the first section of which, after confirming the common field lots and commons to certain towns and villages, of which St. Louis is one, directs the deputy surveyor of the Territory to survey and mark the out-boundary lines of said several towns so as to include the out-lots, common field lots, and commons thereto respectively belonging.

The second section, under which the plaintiffs' claim arose, enacted that:

" All town or village lots, out-lots, or common field lots, included in such surveys, *which are not rightfully owned or claimed by any private individuals*, or held as commons belonging to such towns or villages, or that the President of the United States may not think proper to reserve for military purposes, shall be, and the same are hereby, reserved for the support of schools in the respective towns or villages aforesaid; provided, that the whole quantity of land contained in the lots reserved for the support of schools in any one town or village shall not exceed one-twentieth part of the whole lands included in the general survey of such town or village."

The other act was that of July 27th, 1831.†  The second section of this act, referring to the section just cited from the act of 1812, declares:

" That the United States do hereby relinquish all their right.

---

* 2 Stat. at Large, 748                          † 4 Id. 435.

title, and interest in and to the town and village lots, out-lots, and common field lots, in the State of Missouri, reserved for the support of schools in the respective towns and villages afore-said, by the second section of the above-recited act of Congress, and that the same shall be sold or disposed of, or regulated for the said purposes, in such manner as may be directed by the legislature of the State."

It was conceded that, by the survey made under the first section of the act of 1812, the lot in controversy was found to be within the out-boundary of the town of St. Louis and its common field lots, commons, &c. It was also admitted that by appropriate legislation of the State the plaintiffs have become invested with such right as the State could give by virtue of the last-recited act of Congress.

The surveyor-general at St. Louis, on demand of the plain-tiffs, on the 3d June, 1861, had *caused this lot to be surveyed and certified to them, as a lot embraced within and covered by the reservation for school purposes,* and on this survey and certifi-cate and the acts aforesaid they rested their title.

Such was the plaintiffs' case.

The defendant, who had been in possession by himself and those under whom he claimed from 1844 till the beginning of this suit in 1864, now asserted that this land was, at the time the act of 1812 was passed, rightfully claimed by Joseph Brazeau, a "private individual," and was, therefore, not re-linquished to the State by the act of 1831.

In support of this assertion he showed that, long before the act of 1812, Brazeau had filed with a board of commis-sioners, organized under the act of 1805 to report on such cases, his claim and the evidences of it furnished him by the colonial authorities. Though this first board of com-missioners reported against the claim because he had not proved the inhabitancy and cultivation prior to 1803, which the act of 1805 required, yet Congress, which had never made the reports of these commissioners final, but in all the numerous acts regulating the various commissions appointed for this purpose, had reserved to itself the power to confirm

or reject their reports, did by the third section of the act of 1812 provide for a further hearing on this question of inhabitancy and cultivation. It also in every act on the subject reserved from sale the lands for which claims had been filed with the recorder of land titles, whether confirmed or not.*

Several changes were made in the tribunals authorized to act on these claims, and for a time there was none with such authority.

An act of 1824† directed that individual claims should be presented before a court of the United States within two years, and that unless so presented they should be barred. The time was extended, by subsequent act, to May 26th, 1829. Brazeau did not present his claim under these directions.

Finally, however, by an act of 1832,‡ another commission was organized. The recorder of land titles, in whose office all the old undetermined cases like Brazeau's still remained on file, and two other commissioners, were directed by this act of 1832, to examine all those unconfirmed claims in his office, and classify and report them to Congress. They were to report what claims would have been confirmed under Spanish laws and usages, and what were, in their opinion, destitute of merit under that rule. And while no new claim was to be admitted, they might raise new testimony in addition to that already on file in such cases. This commission passed favorably on Brazeau's claim, the necessary proof of occupancy and cultivation having been made, and reported it to Congress, and that body confirmed the claim by act of July 4th, 1836.§

The St. Louis Land Court gave judgment for the defendant, and the Supreme Court having affirmed, the case was now here for review.

The case was elaborately argued by *Messrs. Blair and Dick, for the plaintiff in error.* They relied largely:

1st. On the fact that Brazeau had not presented his claim

---

* See act of 1805, § 5, 2 Stat. at Large, 327; act of 1806, § 5, Ib. 392; act of 1807, § 8, Ib. 442; act of 1811, §§ 6 and 10, Ib. 664–5.

† May 26th, 4 Stat. at Large, 52.

‡ July 9th, Ib. 565.                                                    § 5 Id. 127.

as directed to do by the act of 1824, and its supplement; that not having done so his power to establish a right was barred, and ended in 1829; that being then without any rightful claim, the act of 1831 vested the title in the State for the use of the schools.

2d. On the survey made by the surveyor-general and mentioned, *supra,* p. 284, as part of the plaintiffs' title, and upon this declaration made by this court in *Kessell* v. *Public Schools,*[*] as to the legal effect of such a document:

"We are furthermore of opinion, that the certificate of the surveyor-general above set forth, and which was accepted by the grantees, is *record evidence of title,* by the recitals in which the government and the board of school directors are mutually bound and concluded. And this instrument, declaring that the land described *was reserved* for the support of schools, and the courts of justice having no power to revise the acts of the surveyor-general, under these statutes, it is not open to them to inquire whether the lands set apart were, or were not, lots of the description referred to in the statutes. The parties interested have agreed that this was a school lot, and here the matter must rest, unless some third person can show a better title."

*Messrs. Todd, Glover, and Shepley, contra.*

Mr. Justice MILLER delivered the opinion of the court.

It is not to be denied that if the lot in question was one of the class which, by the act of 1812, was reserved for the support of schools, that the title was vested in the State by the act of 1831, and by the State in the plaintiffs.

On the other hand, if the lot in question was not of the class reserved for support of schools by the act of 1812, then nothing in the act of 1831 has any effect upon it, and whoever may be the true owner, neither the State or school directors acquired any interest by the act of 1831.

Nothing can be plainer than that the act of 1831 was intended to relinquish the title which remained in the United States to the same lots and lands which had been reserved

---

[*] 18 Howard, 25.

for the support of schools by the act of 1812, and it relinquished title to nothing else.   The one act is the exact complement of the other.   The one *reserved* a class of lots, fields, and commons for the support of schools; the other *relinquished to the State* the title of the lands and lots so reserved for the same purpose.   We are compelled, then, to look to the act of 1812 to ascertain precisely what was reserved.

This presents no *patent* ambiguity, for "all town or village lots, out-lots, or common field lots," included in such surveys, are so reserved, with the exception of three classes. These are:

1st. Such as are rightfully owned or claimed by any private individuals.

2d. Or held as commons belonging to such towns or villages.

3d. Or that the President may think proper to reserve for military purposes.

If the lot in question was covered by either of these exceptions, then it was not reserved by the act of 1812, and was not relinquished to the State by the act of 1831.

The inquiry is still further narrowed in the present case by the fact that it is only claimed to be excluded from the class reserved, because it was rightfully claimed by a private individual.

It will be seen by reference to the statement of the defendants' title, that at the time the act of 1812 made an exception of lots rightfully claimed by private individuals, Joseph Brazeau was asserting a claim before the proper tribunal for this land; that his claim was never abandoned; and that, finally, a competent tribunal, authorized by Congress, decided his claim to be a rightful one, and that Congress, by statute, confirmed this decision.

Unless it is shown in some other way that Brazeau's claim was not a rightful one, we think the plaintiffs have no title; for it is too clear for argument that no land was relinquished to the State by the act of 1831 which was not reserved for schools by the act of 1812, and is equally clear that no land rightfully claimed by a private individual was so reserved.

Two propositions are urged with zeal and ability, as counteracting the effect of Brazeau's claim, on the rights of plaintiffs.

1. It is said that, by virtue of the act of Congress of 1824,* and other amendatory acts, his claim was barred.

The act of 1824 directed that all such individual claims should be presented before a court of the United States, and that unless presented to the court within two years they should be barred; and though the time was subsequently extended, Brazeau did not present his claim within it.

It may be conceded that between this time and the passage of the act of 1832 organizing another board, Brazeau had no claim which he could lawfully assert to this land; and it is said that while his claim was in this condition, the act of 1831 vested the title in the State for the use of schools.

But as the act of 1831 only relinquished the title to lots reserved by that of 1812, and as that reserved none rightfully claimed by private individuals, we must inquire whether the fact that Brazeau had failed to assert his claim within the time limited by Congress, proved that his claim was not rightful. For as a board of commissioners has said that it was rightful, and as Congress has also said it was, this proposition can only be refuted by holding that his failure to assert it for a time, and the declaration of Congress that he could not be heard to assert it afterwards, proved that it was not rightful.

We do not think it had this effect. If it be treated as a statute of limitation, it is not the doctrine on which such statutes are founded, that lapse of time proves the wrongfulness of the claim. They are made for the repose of society and the protection of those who may, in that time, have lost their means of defence. It is a mere declaration of the law-making power to the plaintiff, that having voluntarily slept so long upon his rights, he shall not now be permitted to assert them, to the injury of individuals and the disturbance of society.

---

* 4 Stat. at Large, 52.

In the class of cases before us, the act was nothing more than the declaration of the sovereign power, who at the same time held the fee of the land, that if you establish your equitable claim to the land within a certain time, I will confer the title; if you do not, I will not afterwards hear you assert it. But it was competent for the sovereign, after this forfeiture had occurred by laches, to release it, to consent to hear the claimant, and to give him another chance to prove the rightfulness of his claim. And this is what Congress did by the act of 1832.

It is a little remarkable that Congress did not require in this act that these parties who had been barred by the former acts, should now appear and renew their claim, but it directed the recorder of land titles, in whose office all the old cases like Brazeau's still remained on file, and two other commissioners, to examine all those unconfirmed claims and classify and report them to Congress. They were to report what claims would have been confirmed under Spanish laws and usages, and what were, in their opinion, destitute of merit under that rule. And while no new claim was to be admitted, they might receive new testimony, in addition to that already on file in such cases.

It is very clear that Congress, by this act, intended to remove the restriction on the right to assert these claims imposed by the act of 1824, so far as it concerned those that had been filed in due time with the recorder. We can entertain no doubt of their right to do this, and we do not see that they lost this right by a gratuitous relinquishment of the interest of the United States in lots *not* rightfully claimed by any private individual. They still had, as we think, the right to ascertain whether these old claims, long known and on the public files, were rightful claims or not.

2. It is said that the survey made for plaintiffs of this lot by the surveyor-general, and his certificate that the lot was of those reserved for public schools by the act of 1812, is conclusive, and cannot be disputed.

We do not know of any statute or of any rule of law which should give it this effect. The survey is made *ex parte* by

an officer who has no control of the evidences of claims filed
with the recorder of land titles.

Being an officer of the government, it is possible that this
certificate of a survey, which he is authorized to make, may
bind the United States, but we cannot see how it can deter-
mine, conclusively, the rights of private persons, which are
not considered by him, and still less the rightfulness of a
claim submitted by Congress to other tribunals for inves-
tigation, and reserved to itself for final approval or rejec-
tion.

The case of *Kissell* v. *Public Schools*, is very much relied
on to establish the conclusiveness of this certificate. That
was a contest between the public schools and a person claim-
ing under the pre-emption laws. The court, in discussing
the effect of a certificate of survey in favor of the schools,
precisely like the one in the present case, said that, as to the
public schools, they were bound by it, and so was the gov-
ernment. "The parties interested," says the court, "have
agreed that this land was a school lot, and here the matter
must rest, unless some third person can show a better title."
The court held, in that case, that Kissell did not show a
better title, by a common entry and purchase as pre-emptor,
because the land, being within the limits of the town of St.
Louis, was reserved from sale. The clear implication here
is, that when there is a better title, the certificate of survey
is not conclusive against that title.

JUDGMENT AFFIRMED.